May it please the court, counsel. I speak for defendant appellant Jennifer Lynn, formerly known as Jennifer French. I would like to reserve two minutes for rebuttal. The first of a host of issues that I'd like to address are the FREDA issues. First, the denial of the FREDA right at trial. Second, the denial of the right to make an intelligent choice to proceed pro se. With respect to the... Be sure, counsel, so you do cover it, to focus on the examination of your client by her husband. Yes. The issue there, sir, is that the district court suggested the approach that was taken, permitted the approach that was taken, and directed it twice, once during trial and once during pretrial hearings, that the one pro se defendant, a convicted felon serving a 30-month sentence, should do the examination, the direct examination of an independent co-defendant in that case. While it was not required, it was certainly permitted, directed, and suggested. Our position is that is air under McCaskill for two reasons. First, the FREDA right at trial is, its core, is the right to control one's defense. The normal way this is done in a single defendant trial is the individual takes the stand, swears under oath as a witness, and then asks themselves questions so that the other side, the government, can object, then answers the question. It is awkward, and the district court said it was awkward, but the second part of McCaskill says that this awkwardness is an important characteristic because the jury can look over there and see, this looks different than any other part of the case. The person who's defending themselves is asking themselves the question and answering them. It is the quintessential control of the defense. And even when standby counsel is appointed, standby counsel has an obligation under McCaskill to make certain that the pro se defendant has control of that examination in terms of substance and the defense, which would be, of course, different if he or she, the defendant, was represented by counsel, since they have a right to testify but not necessarily a right to decide how the test, how the case should go forward. So the district court had two choices. One, allow Ms. at that time, Ms. French, to ask herself the questions, answer the questions, if there was no objection, complete her direct examination. Then at that point, a co-defendant, whether it's a pro se co-defendant or someone represented by counsel, at that point they can ask questions, but it's not a direct examination. I agree with you, counsel, that she has a core right to control her defense once she elects to proceed to represent herself. But in this case, let's just assume that the district court's suggestion was ill-advised. The district court also made it very clear that it was her choice in terms of whether she wanted to take that option or whether she wanted to ask herself questions and proceed. And I think he said that at least twice, if not more than that, it's up to you. It's up to you. If you wanted to do it this other way, I would permit it, and it makes it less awkward. But again, that choice is entirely yours. So how does her willing exercise of her right to take up the court's suggestion, take away her right to represent herself? Two reasons. First, by allowing it in this fashion, you have someone who has a conflicting interest, stand by counsel at least ethically, has a client, has her interest and her interest alone at heart. A co-defendant has every right and did so here to maximize his defense by damaging her defense in the questions. And this revolves back to the Feretta waiver of the right. At no point was the conflict in interest between the two defendants, which was substantial, significant and obvious, brought out by the judge of which he knew of it because, of course, at the Feretta hearing, Mr. French had been convicted of 30 counts in a separate wire fraud case, was sentenced to 30 months of imprisonment at that point, and was in custody. So he had a very different situation, and by suggesting it, permitting it, and doing something of which is improper, no pro se defendant can do the direct examination of another pro se defendant. You have to be a lawyer to be in that situation. Of course he can ask questions of witnesses. It's just improper under law. And the damage is he doesn't have the ethical obligation to represent her. And that's where the flaw is in this case. As I mentioned at the Feretta hearing here. And I think it's important to note that the judge did not seek with her husband to map out a joint defense, and that they were together coming up with the questions that the husband ended up asking Ms. French at the time of trial. Because I think it does you're right in the sense that it does circle back to whether her waiver for Feretta rights was knowing involuntary at the outset, but I'm not aware of any case indicating that the court has to tell the person asking to represent herself that, hey, there may be a conflict in the defenses here, in that you can point the finger at your husband, you know, and exculpate yourself. Of course, the downside of that would be inculpating Darren. The case law just hasn't extended that far. And what the district court did in this particular case is to say all but begged her not to go in pro se and to say, look, this is a very complicated case, and your potential defenses need professional evaluation. So once he does that and she says, I know you're really scaring me, but I'm going to go ahead and represent myself anyway, how do we know then that husband and wife didn't sit down together and then map out a joint defense? It's not that uncommon that people with familiar relationships, brothers, sisters, members of the same family or husband and wife are indicted together, and they don't want to point the finger at the other person just to exculpate themselves. The answer to those questions are the following. First, during the Feretta hearing, when the judge first told her about the dangers and disadvantages, she said she was terrified by his words. And the first thing that happened was Mr. French jumped in and said, can I talk to my wife? Then they talked for 20 minutes, and then he answered the questions as a we. The judge says, what's your decision? Our decision is this. We want to go forward. And I cited the Gillings case out of the Ninth Circuit where a similar Feretta hearing, the me too by the wife was not deemed a intelligent waiver. The husband's waiver was, but the wife who was also convicted was not. Second, he was in custody. Just to understand that, she was my recollection, correct me if I'm wrong, was that she was fairly outspoken in the Feretta process, though, didn't she? I mean, she was frightened by the words, but they conferred, and then she was fairly vocal. So how does that fit into what you just said? It fits in, and the first day of September 7th was basically a discussion about what I want my lawyer to do. I have 75 witnesses. I want them to see them. I want the lawyer to do this. When it came to the Feretta, the judge went through the dangers and disadvantages at the beginning of the second day, and that's when she said, your eloquent words have left me terrified. She wanted a lawyer to do something. It was Darren's idea. He wanted to ambush her case. He was controlling the situation. So with respect to the judge going forward with the manner in which this occurred, it played right into a man that he had just sentenced for 30 months, because obviously Darren French wasn't going to take the stand. And the first question out of the government's mouth was, sir, haven't you been convicted of 30 counts of mail and wire fraud? And in that case, it was an obvious fraud. It was 1,800 or so fake Maytag repairs that never had been done. So it was clear that if he went up on the stand, the judge had already ruled that that was going to occur. So what happened was the judge suggested, directed, and permitted him to put his case in through his wife, and never was this conflict that was there presented to her. Now, back to the law that would require that, Your Honor. I've been in multi-defendant cases with nine or 11 defendants, in a nine-defendant case at trial where there were family members. The judge, in a joint defense situation, in separate independent hearings without other counsel and without other defendants there, talked to them about joint defense. Do you realize that you may have a defense that someone else doesn't have? That's fairly standard in even family cases with respect to how that's presented. And lastly, in this area, it was clear that with respect to Jennifer's, the way the questions were phrased, the government kept objecting. He's trying to testify by the way he's asking the questions, and they're posed in we or us versus her independent defense. And she was acquitted of 30 of these counts. Ten of them were dismissed by the government, and it was a very close call on intent, because going to another issue, the jury was basically hung and asked a question about ill intent with respect to the 62 counts. And the supplemental jury instruction that was given that we posit as error focused the jury only on one of the two required elements for criminal intent with all of the counts, the intent to deceive, which is usually the third element, which can be an intent to defraud or deceive. The intent to defraud is either deception or fraud. Instead of knowing participation in the fraud in terms of the first element, which is part of wire fraud. So in doing that, it moved the jury so that Jennifer was not convicted of anything from September all the way into the summer of July 13th. All of those counts were not guilties. It was only after that part where she was convicted. And what she couldn't get out in her independent defense was that it wasn't until October 23rd of 2004 when the cease and desist letter was shown to her, which was the dividing line on where the counts came down. Darren signed for that as certified mail, never showed it to her. And so the positive evidence that they had, which was they put $300,000 into the ABCO purchased in August of 2004, showed that she never moved over to criminal intent. With respect to the count 62, the money laundering count, there is no evidence whatsoever that connects Jennifer to that conviction, that those E-trades were all done by Darren. They came into his separate account. He was the only one that could pull out those counts. So there's absolutely insufficient evidence to convict her of that. And in Darren's appeal, the earlier panel reversed and remanded count 61 for the proceeds versus profits error in that case. But there's simply no evidence to convict Jennifer of count 61, which is the Ford F-250 truck that was purchased once again by Darren. And I've cited where the testimony is. I see I'm down to a minute 30, so I'll sit down. Let me ask you a quick question before you do that, if that's okay with Judge Fisher. Sure. Let's assume that Ms. French had asked the Court to allow her husband to direct her examination and say, because I'm a pro se, I have to testify in this awkward way and it's going to hurt my presentation of my case before the jury, will you, Your Honor, permit me to let my husband direct the examination? Would there still be a problem if she made that choice and the Court said, all right, it's unusual, but I'll go ahead and let you do that? Absolutely. Because he is conflicted from her interests. He is a separate defendant. And that would be where the ABA standard that I cited to steps in and says in cases that are complex, where there's multi-defendants, you appoint standby counsel. And the difference is standby counsel, if I was appointed, I have an ethical obligation to her and her alone in her independent defense. That voluntary choice by Ms. French in that instance, then, can only be cured by the Court advising her of the potential conflict and having her waive it? In that situation, he should have advised it. I don't believe it can be waived. Because let's assume that Darren's trial was a month later. He wasn't in the courtroom. And she says, well, I want my husband to just come in here and do this exam. I don't know of any court that would have permitted that to happen. I don't think you can just pull in your sister-in-law in the role of standby counsel. Standby counsel is a lawyer in front of the Court in serving that role. And so I believe that he needed to advise her of it, but I believe it would have been error to have someone else control that exam. Thank you. Good morning. May it please the Court. Good morning, counsel. Elizabeth Olson White for the United States. The defendant talks a lot about this conflict of interest, but I think what he's really talking about here is the potential of conflicting defenses, which is to say that this defendant could have pursued an independent defense of trying to blame everything on her co-defendant, just as the co-defendant could have pursued an independent defense and tried to blame everything on her. Now, maybe she would have had an easier time of it because he was a convicted felon by the time of trial, or maybe he would have had an easier time of it because virtually all of the communication with the victims, all of the lulling behaviors, the promises of refunds, the merchant accounts, that was all this defendant, Jennifer French. So regardless which one of them would have had an easier time if they had taken the approach of trying to, you know, throw the other one under the bus, they didn't do that. And the record is actually quite clear that Defendant Jennifer French expressly rejected that approach. Her first attorney, who filed a motion to withdraw, had said that, had told the court that he had been trying to come up with defenses, and he said, I can think of one defense that Ms. French is not going to permit me to raise based on her relationship with her husband. Jennifer and Darren French had decided from the beginning, despite advice from their counsel, that they were pursuing a joint unified defense, and that's what they did. Yes, but doesn't that just highlight the conflict, that she is now being examined by someone who has already, through her former counsel, indicated that the husband is controlling the course of the defense in this case, and it's troublesome that, particularly since he has been convicted, there is evidence that he was the mastermind of the Maytag thing, and she wasn't involved in that. So, yes, it's hypothetical, but doesn't the court have an obligation, at a minimum, to alert her and explore whether there is, in fact, a conflict, a potential conflict? Obviously, the judge has to make that call before she takes the stand, and the process begins in front of the jury. There was no effort to do that, to surface, in light of the counsel's earlier statement, to surface whether this was really a wise decision on her part. And secondly, having permitted it, it does appear that there were some questions in the case, in the interchange, that were unfavorable to her, but even if there were not, did not at the end of the preceding testimony, did she ask to be allowed to ask herself some questions? She did not. The judge said that she could, when he, and as Judge Wynn noted, you know, he suggested this, you know, and what the judge said was, if either or both of you decide to testify, my suggestion would be that you have the other one. So the suggestion that the judge was suggesting that Darren try to not testify, but have Jennifer testify, that simply isn't in the record. And what the judge said, you know, I recommend you do it this way, and he said you're not limited to that. You could still follow up with a question of yourself afterwards. And then he went on to say, as you, as Judge Wynn mentioned, and I'm not telling you that you have to do any of this. You make your own decisions on how you handle and conduct your defense. Now, she did not, at the end of Darren French's questions of her, she did not avail herself of asking herself additional questions. You can read the transcript. I think, you know, as I say, they had been doing all of this together. Darren was incarcerated, but prior to trial they had met and gone over. The record, to me, reads as if they had prepared together what questions were going to be asked. But. Kennedy. Was there, excuse me, just a follow-up on the first part of my question of exploring the conflict. I did distract you from that with my going on too long. So focus on the conflict about the court's obligation before permitting this. I agree how it was framed to her. But there was an obvious potential conflict there. So why shouldn't the court have been required to explore the conflict, make sure that his suggestion was a good idea, in fact, and that she could make a properly informed decision, and secondly, consider, if there was any doubt, the appointment of a standby counsel to monitor this. Okay. Two things. First of all, when, and maybe this isn't clear, at the hearing on the first attorney's motion to withdraw, what he said is, there is a defense that Mrs. French will not permit me to raise. And this goes back to something you said earlier. There wasn't any statement at that hearing, I'm concerned that Darren is controlling her and that she's not able to make her own decisions. Oh, I know that. The statement was, she has forbidden me to raise this defense. And I think, you know, what Judge Hicks saw, he had been living with this case for two or three years, and what he had seen is these two defendants operating with a single unified defense. Jennifer filed 30 pretrial and midtrial motions. They were in her name, but they were treated as joint motions on behalf of both defendants. They were presenting a unified defense. There was nothing that could have alerted Judge Hicks to the idea that, oh, maybe they actually want to pursue different defenses, because they just simply had not done that for the two or two-plus years leading up to this. And I think that's actually a good point. I mean, one of the things, this goes back to the Feretta canvas. The defendant makes this claim that, makes this assertion that by choosing to represent herself or by representing herself, that meant foregoing an independent defense. Well, you know, those are two separate questions. There's nothing that says she can't decide to represent herself and still pursue a defense strategy of trying to blame everything on Darren. There was actually one moment in the trial when it looked like she might actually be going that way, when the representative from E-Trade was testifying about the money going from the Look What We Got account into the E-Trade account. Darren had asked him questions on cost examination, and then Judge Hicks said, you know, Mrs. French, do you have any questions? And she said, just one. And she stood up and she said, what was the name on that account? And the answer was Darren French. And she said, okay, thank you. And she sat down. So for a moment it looked like she might be trying, you know, she might have decided to go a different way, but then she didn't. I mean, she, you know, she, Darren did most of the cost examination. She asked a couple of the questions. She testified. There was one, there's one statement in the brief that I think was touched on here, this suggestion that Darren's questioning precluded her from saying that she hadn't seen the cease and desist letter from Viking. And the question, in fact, was specifically asked. Darren asked, you know, he put the letter in front of her and he said, have you seen this? And she said, yes. And then he said, where did you, you know, where have you seen this? And she said, it was mailed to us. So if she had wanted to say, well, I saw it several months later when you finally showed it to me, or if she had wanted to say, well, I saw it once we got the government's discovery, but I didn't know about it at the time. The questions that Darren was asking, you know, the two questions, have you ever seen this letter before? Where have you seen this letter? Those are not questions that preclude her from saying whatever it was that she wanted to say. And what she said was, I saw it. Has Viking mailed it to us? You know, her entire defense was, we had this innovative business plan. We were going to buy high and sell low, and somehow we were going to make a whole bunch of money. And, you know, and she was the one who talked to the victims, who took their orders, who said we can have this for you in two weeks, and then said, oh, we're having a problem. Viking says they can't get it until Labor Day. This is after the cease and desist letter from Viking saying stop. Were you the AUSA who tried the case below? No. No. I think with respect to the Feretta canvas, I would just note that volume two of the defendant's excerpt of record contains the entire 200-page transcript of the five-hour hearing that took place over two days at which Judge Hicks emphatically implored the defendant and her co-defendant not to make what he saw as a very bad decision to represent themselves. And it is true that, I mean, this was the most comprehensive and extensive Feretta canvas I've ever seen. I mean, obviously we didn't see it because the first two-thirds of it was ex parte, but we got the transcript afterwards for the appeal. He went on for pages and pages in significant detail about the dangers and drawbacks of self-representation. And it is true that he, that at one point Jennifer said she was terrified. But put into context, I mean, I think the suggestion is Jennifer said she was terrified and Darren stepped in and said, wait, Your Honor, I want to talk to my wife. Well, this is at the excerpt of record, let's see, page 209 and 210. And what he says is after going through this really extensive statement about the dangers and disadvantages, he says, so now let me ask you the critical, and maybe you want a moment, maybe you want to discuss this with your counsel or discuss it with each other, I'll let you do that. And she said, well, Your Honor, I would like a moment, because what you've said has terrified me. And he said, you know, it's not my, it wasn't my intention to make you feel bad, I just want to educate you about this, and then they took a moment. And then they took a break of about 20 minutes. I know the record is clear that she did consult with her husband. It's not clear whether she also consulted with her counsel who was still there in the room. But when they came back from that and each defendant said, yes, I want to represent myself, then the judge went through the entire FREDA canvas where Jennifer acknowledged, I think it was eight or nine times, that this was her decision, she was making it knowingly, it was voluntary, she understood that it could be permanent, she understood the dangers, she understood the penalties, she understood what she was charged with, and it wasn't for purposes of delay. And, I mean, there was a lengthy, lengthy colloquy that he did both with Darren and with Jennifer, each independently, that went on for pages and pages. So the fact that at one point earlier in the hearing she had said, you know, I'm scared about this, you know, this worries me, that was before this lengthy colloquy. I mean, you know, I think district court judges are in such a tight spot here, because you have a constitutional right to represent yourself and a constitutional right for counsel, and whichever way it goes in the district court, the defendant on appeal is going to say it should have been the other way. Okay. Counsel, we've got that point. Could you address the count 61, yes, on the count 61, the supplemental response and the, I think they're connected, actually, but anyway, the evidence on the money laundering? Yes. And my understanding, as defendant pointed out in his reply brief, another panel of this court decided this issue in Darren French's direct appeal, and I think it's pronounced United States v. Schaaf says that the law of the case doctrine does apply to co-defendants who are tried separate, who are tried together and appealed separately. So my understanding is what the panel found, that there was a Santos problem with respect to count 61, which was the Ford F-250 truck, and that there was not a Santos problem with respect to count 62. Just to be clear, the government disagreed with the panel's decision with respect to 61, and we did file a petition for panel rehearing pointing out what we saw as some very serious errors with the court's analysis, but that petition was denied and we did not pursue it further. So my understanding is that that is the law of the case with respect to both counts 61 and 62. 61 would need to be vacated. The defendant got, on her 22 counts of conviction, got concurrent 24-month sentences, so this wouldn't require resentencing. It would just be remanded for the vacating of that conviction and entry of an amended judgment. Okay. Thank you. Okay. Just very briefly, this idea that with respect to the Ferretta canvas, there is no case from any court that I've found or that defendants cite that suggests that when there are co-defendants, and any time there are co-defendants, virtually any time there are co-defendants, you're going to have this potential of conflicting defenses. But there's just simply no case that says that there's additional questions or additional inquiry that needs to be made during a Ferretta canvas when there are co-defendants. So I think that that's just obviously we don't think that there was any error at all. We think that Judge Hicks is, I mean, as I say, this is the most comprehensive Ferretta canvas I've ever seen, and so we don't think that there was error at all, but certainly not plain error in the absence of any court case. Back to Count 62 for a moment. Is there any evidence connecting her to this E-Trade account that's the subject of that count? Yes. Well, she testified. What she said about with the E-Trade, you know, the testimony was, and this is on 1869 of the excerpt of record. He's talking about or he's questioning her about the purchases and what happened to the things that were purchased, the boat and the truck. And then she was saying that, oh, we sold that and we put the money back into the business. And then at 1869 she says, same thing with the E-Trade stocks. That was sold, put back into the business, whatever we could do to keep our business running because that's what we were trying to do. So with respect, I mean, yes, the E-Trade account was in his name, but her testimony at trial indicated that she was aware of that account and that they were making decisions together. I mean, I think, frankly, through the whole trial, the defense that they presented, which is the same defense they had presented in all of their pretrial motions for the two years leading up to this. But other than general testimony that, yes, this is what we were trying to do, is there any more specific evidence that shows that she had access to the account or that she knew about it, knew about the transfers? That she knew about. She testified about the account. Let's see. She testified. I cited two spots in my brief. I'm sorry, I don't have those pages on me, where she testified about the account. But this one specifically, which is not cited on my brief, I don't think. But, you know, this was where I think that the jury could infer, and obviously on sufficiency, it's a very low standard for the jury, where she said that that was sold and put into the business. Whatever we could do, this is what we were trying to do. That is evidence from which the jury could infer knowledge of that. And, again, with respect to allowing Darren to conduct the cross-examination of Jennifer, two points. One is the judge made very clear that this was her decision, that she didn't need to do it this way, that it was entirely up to her how she wanted to conduct her defense, and that she could, even if she did decide to do it this way, could still ask herself questions, which she decided not to do. Okay. Counsel, you're well over time. I apologize. Thank you. Thank you very much. Appreciate the argument. Counsel, you can have two minutes. Thank you. Rule 44 is the analogy here. If Jennifer and Darren had showed up, and one lawyer was going to represent both of them, Rule 44 tells the court to conduct that examination, make certain that there's no conflict in one lawyer representing these two folks. That's a minimum that we would ask, back to the court's question about the conflict. A district court has, at a minimum, the same requirement when two pro se individuals are in front of them, that one would have when one lawyer seeks to represent two individuals, and we cited that in the brief. And at a minimum at that point, that's where standby counsel should have been appointed to control any direct examination. With respect to the letter, it was certified mail to Darren French, not to both of them, and that's in the record. And so that's why later on in 2011, when you're talking about it, it was certified and signed by him as a certified letter. Third, with respect to the Count 62, there was nothing other than testimony in 2011 that she was aware of it in 2011. The testimony was she didn't know about the E-Trade accounts. Why? Because they were Darren's separate account. She had no ability to access that account, and those monies did not flow through their joint account. They went directly to his account. Finally, with respect to the issue of sentencing, if the court was to reverse on just Counts 62 and 61 alone, the money laundering counts, that would affect the and there would need to be a resentencing. At issue, there's a notion that somehow this was a joint defense. This was a joint defense to maximize Darren's ability to acquit himself with his wife being damaged in the process. Thank you. Thank you, counsel. Well argued, and we appreciate the argument. The case is submitted.
judges: Noonan, Fisher, Nguyen